**PHILADELPHIA CITIZENS IN ACTION by Roxanne Jones, Executive Director and Trustee Ad Litem and Philadelphia Welfare Rights Organization, by Louise Brookins, Executive Director and Trustee Ad Litem**

v.

**Richard SCHWEIKER, Secretary, United States Department of Health and Human Services and Helen O'Bannon, Secretary, Department of Public Welfare Commonwealth of Pennsylvania.**

**Civ. A. No. 81–4452.**

United States District Court, E. D. Pennsylvania.

Nov. 20, 1981.

184

Douglas G. Dye, C.L.S., Philadelphia, Pa., for plaintiff.

John O. J. Shellenberger, Deputy Atty. Gen., Com. of Pa., Philadelphia, Pa., Linda L. Cromwell, U. S. Dept. of Justice, Civ. Div., Washington, D. C., for defendants.

## OPINION

JOSEPH S. LORD, III, Chief Judge.

Plaintiffs filed this action on October 30, 1981 seeking preliminary and permanent injunctive and declaratory relief against federal and state defendants to prevent them from "taking any agency action based in whole or in part on Federal AFDC Regulations published at 46 Fed.Reg. 4670 *et seq.* (9/21/81), and upon conforming State AFDC Regulations ...." Plaintiffs are welfare rights advocates whose membership includes welfare recipients directly affected by the challenged rules. Defendants are Richard Schweiker, Secretary of the United States Department of Health and Human Services (HHS), and Helen O'Bannon, Secretary of the Pennsylvania Department of Public Welfare.

On November 2, 1981, I held a hearing and argument on plaintiffs' motion for a temporary restraining order. The following day, plaintiffs having failed to establish that they would suffer irreparable harm from denial of their motion, I denied their motion for a temporary restraining order and set the matter for final hearing and argument. On November 17, 1981, I heard final hearing and argument on plaintiffs' request for a declaratory judgment and permanent injunction.

For the reasons that follow, I hold that plaintiffs are entitled to both a declaratory judgment invalidating portions of the federal regulations and permanent injunctive relief preventing Commonwealth implementation of its current regulations.

## I. Factual Background

### A. The Omnibus Budget Reconciliation Act (OBRA)

Congress enacted the OBRA, Pub. L. No. 97–35, 95 Stat. 357 (1981), on August 13, 1981. Sections 2301 through 2321 of that statute legislated major changes in the joint federal/state welfare program known as Aid to Families With Dependent Children (AFDC), 42 U.S.C. §§ 601–675. The statutory changes, which mostly affect welfare payments to the working poor, were generally effective on October 1, 1981.[1]

### B. The HHS Interim Final Regulations

According to the testimony of Michael DeMaar, the Director of Policy for the Office of Family Assistance in the Social Security Administration, the planning that ultimately led to promulgation of the interim final regulations at issue in this case began with the formation of a study group in May 1981. Participants in this group included both federal and state bureaucrats. Its first order of business, according to Mr.

DeMaar, was to formulate plans to implement a timetable to ensure timely promulgation of regulations under what was still only proposed OBRA legislation. At this time, almost six months before the actual effective date of OBRA, HHS decided to avoid the usual notice and comment procedures mandated by the Administrative Procedure Act (APA), 5 U.S.C. §§ 500–576, and instead to issue interim final regulations implementing OBRA.

The record is replete with testimony concerning the informal efforts of HHS to obtain comments on its proposed regulations. First, on July 2, 1981, HHS sent a letter to several large organizations representing various portions of the population requesting their input in the development of regulations on the proposed OBRA legislation. Only two organizations, the AFL–CIO and the Pacific Legal Foundation, responded to this first mailing.

Second, on July 22, 1981, Mr. DeMaar sent a letter to thirty-two organizations (Exhibit G–2) including the Philadelphia Welfare Rights Organization, one of the plaintiffs in this litigation. That letter informed the addressees that Congress was currently considering amendments to the AFDC program, that HHS had begun development of implementing regulations, and that the thoughts, suggestions, and comments of each addressee would be appreciated as part of that process. (Exhibit G–1) Only one of these thirty-two addressees, the National Association of Social Workers, responded. That response objected to HHS's use of the interim final regulation procedure and complained about the short time allowed for comment.[2] No draft regulations were enclosed with the HHS letter and HHS made no attempt to recontact any of the thirty-two organizations to whom the letter was addressed after development of draft regulations.

---

1. On September 30, 1981, defendant O'Bannon wrote Rose M. Lepore, Regional HHS Commissioner, requesting a waiver of the October 1, 1981 effective date pursuant to § 2321(b) of OBRA. (Exhibit P–1) That letter requests a waiver from implementation until January 1, 1982 or, in the alternative, until November 1,

1981. Despite Mrs. O'Bannon's request for a decision by October 15, 1981, as of November 17, 1981 the federal defendant has yet to respond.

2. The letter requested written comments by August 7, 1981.

Third, on August 13, 1981, and again sometime early in September, HHS provided working drafts of proposed regulations to the Association of Public Welfare Administrators (APWA), an agency whose membership consists primarily of state welfare administrators. Although Mr. DeMaar testified that the August 13 draft (Exhibit P-2) involved no exercises of discretion by the federal Secretary, from my review of that draft I conclude otherwise. It is clear, however, that that draft was merely a preliminary working paper bearing little resemblance to the interim final regulations that were ultimately promulgated. It is also undisputed that this draft had not been submitted through normal clearance procedures in HHS. It appears from the record, however, that the draft of regulations distributed to the APWA in early September was essentially the same set of regulations that was ultimately published in the Federal Register.[3]

Fourth, HHS conducted two conferences (one in Phoenix, Arizona and the other in Philadelphia, Pennsylvania) in mid-September for the benefit of state welfare administrators. Apparently, the major function of these conferences was to familiarize these administrators with the provisions of the then virtually completed interim final regulations. (*See* Exhibit P-3)

Mr. DeMaar testified that as of September 3, 1981 the proposed regulations had completed all internal clearance procedures within HHS. At that point, they were submitted to the Office of Management and Budget (OMB) pursuant to Executive Order 12291, 46 Fed.Reg. 13193 (Feb. 19, 1981). Following approval by OMB, the regulations were published on September 21, 1981. 46 Fed.Reg. 46750–73 (Sept. 21, 1981). Consistent with the decision made in May 1981, the regulations were published in interim final form with a sixty day post-publication comment period. Although that comment period is scheduled to conclude November 20, 1981, HHS had received only nine comments as of November 16.

## C. Pennsylvania's Regulations

The Commonwealth asserts that it has inherent authority independent of the federal Secretary's issuance of regulations to implement OBRA. As discussed below, I need not decide on the facts of this case whether this assertion of authority by the Commonwealth is valid. In any event, Pennsylvania promulgated its own state regulations implementing the provisions of OBRA and the federal regulations on November 7, 1981 to be effective November 9, 1981. 11 Pa.Bull. 3954–82 (Nov. 7, 1981).[4]

The record also shows that Pennsylvania welfare officials attended the Philadelphia conference sponsored by HHS in the middle of September 1981. The Commonwealth, however, according to the testimony of Gregory O'Beirne, Director of the Office of Policy in the Commonwealth Department of Public Welfare, began drafting its regulations in July 1981. At that time, the policy analysts were using congressional material and documents and information supplied to them by the APWA.

## D. OBRA's Effect on Pennsylvania AFDC Recipients and the State Fisc

As noted earlier, the major effects of OBRA will be felt by AFDC households containing at least one working member. According to the official projections of the Pennsylvania Department of Public Welfare, 17,840 households containing 53,520 persons currently receiving AFDC benefits will be rendered ineligible under the standards of OBRA. An additional 23,950 households composed of 57,050 individuals face reductions in their AFDC benefits as a

---

3. I reach this conclusion because of Mr. DeMaar's testimony that the interim final regulations had been drafted and cleared internally by September 3, 1981.

4. Although the regulations are effective November 9, 1981, according to the record, the first cuts in benefits to Pennsylvania AFDC recipients will not occur until December 1, 1981. The record also contains evidence to the effect that the computer run that will issue checks to recipients at the reduced benefit levels cannot be stopped after November 23, 1981.

result of the Commonwealth's implementation of OBRA.[5] (Exhibit D–3)

The Commonwealth's figures also demonstrate that the size of the reductions mandated by OBRA is quite substantial. The average benefit loss per month for each household facing termination of AFDC assistance as a result of OBRA is $133.49, ranging from $4 to $270, depending on the number of individuals in the household and the specific provisions affecting the particular household. Further, the average benefit loss per month for each household facing a reduction in benefits as a result of the Commonwealth's implementation of OBRA is $64.24, with a range from $6 to $263.

Any delay in the Commonwealth's implementation of the cuts in the AFDC program prescribed by OBRA will have a substantial effect on Pennsylvania's state treasury. These effects can be analytically divided into two distinct categories. First, the Commonwealth stands to save in excess of $2.2 million dollars each month of implementation.[6] Second, if Pennsylvania fails to implement the OBRA cuts, and continues to pay benefits at the old payment level, it is possible that HHS will deny Pennsylvania federal financial participation for benefits paid inconsistent with the requirements of OBRA. If HHS denied the Commonwealth federal financial participation for this reason, Pennsylvania would be forced to expend in excess of an additional $2.9 million dollars for each month that it was found not in compliance with federal standards. Thus, the total potential drain on the Pennsylvania state treasury should the OBRA cuts not be implemented and should federal financial participation be denied is in excess of $5.2 million dollars each month.

**5.** Mr. O'Beirne testified that the total Pennsylvania AFDC population included approximately 200,000 households and 800,000 individuals. My rudimentary calculations establish that, based on these figures, the average size of an AFDC household in Pennsylvania should be four persons. Yet, the Commonwealth's figures, set forth in Exhibit D–3, are based on an assumed three person AFDC household. I therefore note that the Commonwealth's estimates as to the number of persons that will be affected by implementation of the OBRA cuts should be viewed as extremely conservative.

## II. Validity of the Federal Regulations Under the APA

It is plaintiffs' position that, in promulgating the OBRA implementing regulations without a prior notice and comment period, the federal defendant violated the provisions of the APA. They ask that I therefore declare those regulations invalid. The federal defendant argues, however, that he had "good cause" under the APA to dispense with that statute's normal rule-making procedures. The first key issue to resolve, therefore, is whether the federal Secretary had good cause for proceeding in the manner in which he did. For the reasons that follow, I hold, both as a matter of law and as a matter of fact, that good cause did not exist for dispensing with normal rule-making procedures and, therefore, that HHS's promulgation of implementing regulations for OBRA was invalid.

### A. THE APA

My decision of this first crucial issue turns on the following statutory section:

(b) General notice of proposed rule-making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place, and nature of public rulemaking proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

**6.** Actually, Mr. O'Beirne testified that some portion of that savings would accrue from the Commonwealth's implementation of the elimination of the "thirty and one-third" work incentive provision after the first four months of eligibility. As a result, some portion of the $2.2 million dollars savings each month would not begin to accrue until four months following Pennsylvania's implementation of the OBRA cuts.

Except when notice or hearing is required by statute, this subsection does not apply—

    (A) to interpretative rules, general statements of policy, or rules of agency, organization, procedure, or practice; or

    (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefore and the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

5 U.S.C. § 553(b).

One key distinction that must be drawn by any court deciding whether the traditional notice and public comment procedures of the APA need be followed in any particular case is the difference between "substantive rules," on the one hand, and "interpretative rules," on the other. I note first that HHS, in its preamble to the regulations at issue in this case, did not rely on the interpretative rule exception in its justification for dispensing with a notice of proposed rulemaking. *See* 46 Fed.Reg. 46750 (Sept. 21, 1981). Even beyond this, however, I hold that, under controlling principles of law, all sections of these regulations involving an exercise of discretion by the federal Secretary are substantive rules for the purposes of the APA.

    In determining whether a particular rule is substantive or interpretative, the court must "look to such factors as the real effect of the rule, the source authority for its promulgation, and the force and effect which attach to the rule itself." *Hou Ching Chow v. The Attorney General*, 362 F.Supp. 1288, 1292 (D.D.C.1973). "Procedural rules are those that relate to the method of operation of the agency, while substantive rules are those which establish standards of conduct or entitlement." *Aiken v. Obledo*, 442 F.Supp. 628, 649 (D.Cal.1977). Finally, other courts have held that substantive rules will carry the "force of law" while interpretative rules will not bind a reviewing court. *See, e. g., Haddon Township Board of Education v. New Jersey Department of Education*, 476 F.Supp. 681, 691 (D.N.J.1979).

    Under these standards, I hold that all the sections of the regulations discussed in Appendix A *infra* as involving exercises of discretion by the federal Secretary are substantive rules within the meaning of the APA. I so hold whether the discretion exercised by the Secretary is authorized expressly in OBRA or on the Secretary's "own motion." I reach this conclusion for a number of reasons.

First, it is clear from the arguments presented to me during this case that the federal defendant intended that all of its regulations will have the "force of law" as applied to the states. Second, it is also clear that the federal defendant intended the courts to accord appropriate deference to these regulations—including sections of the regulations that involve the federal Secretary's exercise of discretion on his own motion—should judges be presented with a question of regulatory interpretation. Third, the authority cited for the regulations is a new statute. *See, e. g., Hou Ching Chow*, 362 F.Supp. at 1292 ("[t]he promulgated notice expressly cited statutory authority for the issuance of regulations by the [responsible agency]"). Finally, even beyond the standards applied in the case law, I find as a matter of public policy, based on my comprehensive review of the substance and potential effect of each of the regulations, that the Secretary has exercised the type of discretion, affecting substantial rights of the public, that Congress would have intended the public to comment on under the APA.

    My resolution of this issue requires a corollary finding. I also hold that, even in the absence of good cause, the sections of the federal implementing regulations that involve no exercise of discretion by the Secretary are valid under the interpretative rule exception to the APA. Specific consideration of the federal regulations has been deferred until Appendix A.

### B. The Existence of Good Cause

    The law in the Third Circuit on what constitutes a sufficient finding of good

cause to justify dispensing with traditional notice and comment procedures under the APA is relatively clear.[7] The good cause exception is to be "narrowly construed." *American Iron and Steel Institute v. Environmental Protection Agency*, 568 F.2d 284, 292 (3d Cir. 1977). In support of its holding that the exception was to be construed narrowly, the court cited certain relevant legislative history:

> "Impracticable" means a situation in which the due and required execution of the agency functions would be *unavoidably prevented* by its undertaking public rule-making proceedings ... "Public interest" supplements the terms "impracticable" or "unnecessary"; it requires that public rule-making procedures shall not prevent an agency from operating and that, on the other hand, lack of public interest in rule making warrants an agency to dispense with public procedure. Senate Rept. No. 752, 79th Cong., 1st Sess. at 16. (1945)

*Id.*

In both *American Iron and Steel* and *Sharon Steel Corp. v. Environmental Protection Agency*, 597 F.2d 377, 380 (3d Cir. 1979), the Third Circuit held expressly that time pressure on an agency caused by rapidly approaching effective dates for the underlying legislation does not constitute good cause for dispensing with the APA's normal notice and comment requirements. The discussion in *Sharon Steel* on this issue is particularly instructive:

> In enacting amendments to the Clean Air Act, Congress gave no explicit indication that it intended to override the procedural safeguards of the APA. The amendment set the December 5, 1977, deadline for submission of state designations, the February 3, 1978, deadline for the Administrator's review, and the January 1, 1979,

deadline for state implementation plans. Even at the time when Congress passed the amendments to the Clean Air Act, the circumstances that the Administrator advances as good cause should have been apparent. Nonetheless, Congress nowhere recorded any *express indication* that the 1977 amendment should relieve the Administrator from the ordinary procedures set forth in the APA for rulemaking.

*Sharon Steel*, 597 F.2d at 380 (emphasis added).

█ Finally, it is also crystal clear under applicable Third Circuit precedents that a period for comment following publication of final regulations is not a valid substitute for the normal provisions of the APA:

> We hold that the period for comments after promulgation cannot substitute for the prior notice and comment required by the APA. If a period for comments after issuance of a rule could cure a violation of the APA's requirements, an agency could negate at will the Congressional decision that notice and an opportunity for comment must precede promulgation. Provision of prior notice and comment allows effective participation in the rulemaking process while the decision maker is still receptive to information and argument. After the final rule is issued, the petitioner must come hat-in-hand and run the risk that the decision maker is likely to resist change.

*Sharon Steel*, 597 F.2d at 381.

█ Under these precedents, I hold as a matter of law that the federal defendant did not have "good cause" for dispensing with the notice of proposed rulemaking otherwise required under the APA. The main justification asserted for this action, that

7. The federal defendant cites a great deal of authority apparently in conflict with the Third Circuit's view of the law on this issue. *See Republic Steel v. Costle*, 621 F.2d 797 (6th Cir. 1980); *United States Steel v. Environmental Protection Agency*, 605 F.2d 283 (7th Cir. 1979), *cert. denied*, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980); *Arizona State Department of Public Welfare v. Department of Health, Education and Welfare*, 449 F.2d 456, 481 (9th Cir. 1971), *cert. denied*, 405 U.S. 919, 92 S.Ct. 945, 30 L.Ed.2d 789 (1972). I decline to follow this authority for two independent reasons: first, I view the Third Circuit precedent as controlling, and second, where reasoning is presented in the other court of appeals cases, I am unconvinced by it.

the OBRA passed only forty-eight days before its scheduled effective date, has been explicitly and repeatedly rejected as good cause in the Third Circuit. The logic of Judge Rosenn's analysis in *Sharon Steel* is inescapable: to hold otherwise would allow Congress to override the notice and comment provisions of the APA merely by placing an effective date in every statute that put some time pressure on the administering agency. It is eminently more reasonable to expect Congress to enact an express override to those provisions of the APA when it wishes to achieve that result. Finally, neither the informal pre-publication comments solicited by HHS nor the more formal post-publication comment period provided for in the September 21, 1981 promulgation is sufficient to cure this fatal defect.

■ Independent of my conclusion of law above, I also hold as a matter of fact that the federal defendant lacked good cause to dispense with normal APA procedures for notice and comment. I note in this regard that the parties agree that determinations of good cause must be resolved on a case-by-case basis by the factfinder.

The federal Secretary asserts two basic justifications for dispensing with the notice of proposed rulemaking in the preamble to his regulations. First, he asserts that the time pressure created by the late passage of OBRA and the early effective date of October 1, 1981 made it infeasible to issue these rules as a Notice of Proposed Rule Making (NPRM) "as this would have delayed issuance of final rules until well past October 1, 1981." 46 Fed.Reg. 46750 (Sept. 21, 1981). The rationale behind this justification was that the states needed certain guidance from the federal government in order to implement efficiently their own OBRA changes. Second, the Secretary asserted that dispensing with normal notice and comment procedures "will permit the State and Federal governments to capture the greatest amount of cost savings from these provisions and this will be to the benefit of the public." *Id.*

I recognize that HHS's finding of good cause to dispense with normal notice and comment procedures is entitled to some deference by the courts. *See Durkin v. Wagner Co.*, 115 F.Supp. 118, 122 (E.D.N.Y. 1953), *aff'd sub nom. Mitchell v. Wagner Co.*, 217 F.2d 303 (2d Cir. 1954), *cert. denied*, 348 U.S. 964, 75 S.Ct. 524, 99 L.Ed. 752 (1955); *American Iron & Steel*, 526 F.2d at 1047. But I hold that the Secretary's determination is both arbitrary and an abuse of discretion in that it is wholly unsupported by the testimonial and documentary record before the court.

I base my factual finding that the Secretary failed to meet the good cause exception of the APA on a complete review of the testimonial and documentary record, revealing that HHS could have promulgated a final rule before October 1, 1981 even using the NPRM procedure.[8] The record shows that HHS made its decision to dispense with normal notice and comment procedures in May 1981, almost six months before the actual effective date of the statute. Even accepting Mr. DeMaar's initial estimate that the non-expedited NPRM procedure would take six months, there was no justification in May for electing to dispense with normal APA procedures.

---

8. I make this finding even though the record is also devoid of any indication that the Secretary *had* to issue final regulations by the effective date of the statute. The only asserted justification for requiring a final rule to be promulgated before the effective date of the statute was that this would be necessary in order to give the states guidance in the implementation of their own programs. But, as Pennsylvania's position in this litigation makes clear, it would not be necessary to have final regulations in place by the effective date of the statute in order to provide this guidance. The record conclusively demonstrates that the states have strong incentives of their own to comply with OBRA—namely, that by complying they will save substantial amounts of state funds. Thus, more informal guidance from the federal government, such as conferences and a published NPRM, would have been sufficient to meet the goal of providing guidance to the states.

I also note that implementation of final regulations by the effective date of other statutes has not been deemed essential by other courts considering this issue. *See, e. g., Sharon Steel*, 597 F.2d at 380, 380 n.7.

Putting this theoretical evidence aside, and looking instead to how HHS actually developed these regulations, I still conclude that no good cause existed. The record is clear that HHS had a rough draft of proposed regulations on August 13, the same day OBRA passed. (*See* Exhibit P–2) Although it is also true that this draft was extremely preliminary, there is no reason why an NPRM could not have been published on or shortly following the August 13 date. Under the APA, a NPRM need contain "*either* the terms or substance of the proposed rule *or a description of the subjects and issues involved.*" 5 U.S.C. § 553(b)(3) (emphasis added). Following that publication, HHS could have taken the identical steps that it performed to meet its objective of publishing an interim final rule before October 1, 1981. It could have circulated that draft to the APWA, it could have developed a new draft based on the comments on the first draft, it could have added the comments that would have come in as a result of publication of the NPRM, it could have circulated a new draft to the APWA in early September, it could have put its final draft through OMB and HHS clearance procedures, and it could have held the two conferences in Arizona and Pennsylvania for the benefit of state administrators to provide them guidance on implementation of OBRA. The fact is that HHS polished that August 13, 1981 draft into interim final regulations which had cleared all HHS and OMB administrative obstacles by September 21, 1981, ten days before the effective date of the statute.

Viewed in this light, it is inconceivable how the federal defendant can maintain that, had it chosen to pursue the NPRM procedure in May 1981, it would not have been able to promulgate final regulations by October 1, 1981. The only additional burden placed on HHS had it published the regulations as a NPRM is the burden of reviewing the additional comments that that publication would generate. The federal defendant appears to argue that all work would have had to cease during the minimum thirty day comment period mandated by the APA. Nothing in the record supports such a contention. Thus, from the middle of August until the middle of September, during the thirty day public comment period, HHS could have continued to perform the same tasks that it actually performed during the same time period on the facts of this case. That HHS was able to transform the extremely rough working draft of August 13 into the polished regulations that appear in the Federal Register by September 3 (when the regulations were sent to OMB for clearance) is conclusive proof of its capacity to transform the hypothetical NPRM of August 13 into a final rule by the middle of September for transmittal to OMB for the same clearance.

## C. The Appropriate Remedy

■ Having held that, as a matter of law and, independently, as a matter of fact, HHS lacked good cause to dispense with normal public comment and notice procedures under the APA, it is necessary to address the second important issue in this case: the appropriate relief.

Plaintiffs have requested me to enter a declaratory judgment holding the federal regulations invalid under the APA and remanding the matter to HHS for further proceedings consistent with the requirements of that statute. The federal defendant offers a unique argument in support of its contention that such broad relief would not be appropriate on the facts of this case. The Secretary notes that the only harm alleged by plaintiffs flows from their claimed lack of participation in the public comment process. With respect at least to Pennsylvania welfare recipients, the Commonwealth will not implement the cuts mandated by OBRA until December 1, 1981, ten days after the expiration of the postpublication comment period provided in the Secretary's promulgation of his interim final regulations. Thus, the federal defendant argues that *these* plaintiffs will have had the opportunity to comment on the proposed federal regulations *before* any adverse action is taken against any Pennsylvania AFDC recipient. The Secretary argues, therefore, that no relief is necessary beyond November 20, 1981.

I am governed by the Declaratory Judgments Act which provides that a court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201. In *Bituminous Coal Operators' Association, Inc. v. International Union, United Mineworkers of America*, 585 F.2d 586, 596–97 (3d Cir. 1978), the Third Circuit offered the following guidance to trial judges:

> The district court, in determining the appropriateness of declaratory relief, must take into account: (1) the likelihood that the declaration will resolve the uncertainty of obligation which gave rise to the controversy; (2) the convenience of the parties; (3) the public interest in the settlement of the uncertainty of obligation; and (4) the availability and relative convenience of other remedies.

Although impressed by the novelty of the Secretary's argument in this case, I remain unconvinced by its logic. Under my view of the law, which I believe finds substantial support in the Third Circuit decisions in *Sharon Steel* and *American Iron and Steel*, the opportunity for post-publication comment on an interim final regulation is not legally equivalent to the opportunity for pre-publication comment under the NPRM process. This legal conclusion is buttressed by the uncontroverted testimony of Ms. Betty Van Dyke, a board member of the Philadelphia Citizens in Action, one of the plaintiffs here, that her organization did not comment during the post-publication comment period because of its view that the agency had already made up its mind. Thus, in order to achieve "basic fairness" and restore plaintiffs "as nearly as possible . . . to the position they would have occupied if [the agency] had afforded them their rights to prior notice and an opportunity to comment," *Sharon Steel*, 597 F.2d at 381, I hold that it is necessary to provide them with a realistic opportunity to comment on proposed regulations before their publication in final form.

Applying the four factor test suggested by the Third Circuit in *Bituminous Coal*, I conclude that plaintiffs are entitled to their declaratory judgment. A declaratory judgment would completely resolve the uncertainty concerning the validity of these regulations. Although I have no doubt that this decision will be inconvenient to the federal government and the states, no evidence on this issue is present in the record. Further, the harm caused to the plaintiffs as a result of the deprivation of their rights to comment on these proposed regulations at a meaningful time is entitled to substantial weight. Further, the public interest in a definitive settlement of the uncertainty surrounding the validity of these regulations is extraordinarily high. Finally, I have been unable to locate, and the parties have not cited, any other potential remedy that would be as effective in restoring the plaintiffs to their rightful position.

I will therefore issue a declaratory judgment invalidating all sections of the Secretary's interim final regulations that constitute "substantive rules." Appendix A contains a comprehensive discussion of which sections of the Secretary's interim final regulations I hold involve an exercise of discretion by the Secretary sufficient to make those sections "substantive rules" under the APA.[9]

### III. Commonwealth Implementation of OBRA

Having held that the federal Secretary lacked good cause to dispense with the normal APA notice and public comment procedures and having held that plaintiffs are entitled to declaratory relief holding certain sections of the federal regulations invalid, it is now necessary to reach the third key issue in this case: are the plaintiffs entitled to any relief against the Commonwealth? The plaintiffs have requested a permanent

---

**9.** It is my view, based on the record and law in this case, that HHS should begin its entire promulgation process anew because of the pervasive invalidity of so many of the sections of its regulations. Nevertheless, because of my holding that sections of the regulations that restate or paraphrase statutory provisions are "interpretative rules" under the APA, it is beyond my authority to hold the entire set of federal regulations invalid.

injunction to enjoin the Commonwealth from implementing the OBRA cuts because the Pennsylvania regulations, or at least a substantial portion of them, rely on the invalid federal regulations for their authority. On the other hand, the Commonwealth argues that it has inherent and independent authority to implement OBRA, that it could and would have had to implement the statute even if the federal government did not promulgate regulations, and that, therefore, my declaration that the federal regulations are invalid should not affect its capacity to implement the provisions of OBRA.

## A. Standards for Granting a Permanent Injunction

■ A district court deciding whether a permanent injunction should be issued must undertake a three stage inquiry. First, the court must decide whether plaintiffs actually have succeeded on the merits of their claim. Second, the court must decide whether the "balance of equities" favors the granting of injunctive relief. Finally, the court needs to decide what form the injunctive remedy should take. *See, e. g., Sierra Club v. Alexander*, 484 F.Supp. 455, 471 (M.D.N.Y.), *aff'd*, 633 F.2d 206 (2d Cir. 1980); *Minnesota Public Interest Research Group v. Butz*, 358 F.Supp. 584 (D.Minn. 1973), *aff'd*, 498 F.2d 1314 (8th Cir. 1974).

■ Particularly when "balancing the equities," the trial judge should exercise discretion in determining the propriety of injunctive relief. Among the factors traditionally considered in this balance are: the adequacy of another remedy; the benefit to the plaintiff if injunctive relief is granted and hardship if such relief is denied; the hardship on the defendant if injunctive relief is granted; the hardship on third parties; the convenience and effectiveness of administration; and the public and social consequences of either granting or denying injunctive relief. *See* J. Moore, 7 Moore's Federal Practice, ¶ 65.18[3], at 65–136 to 65–140.1 (1980).

## B. Do Plaintiffs Prevail on the Merits?

■ It is entirely possible that the Commonwealth's interpretation of applicable administrative law precedents is correct and that, if the federal agency had not acted, the states could and would have had to implement OBRA on their own. If this is true, then it is also possible that the Commonwealth correctly argues that it has inherent authority to implement the cuts contemplated by OBRA notwithstanding part II of this opinion. But it is also possible that the plaintiffs are correct in their argument that the statute vests too much discretion in HHS for any state to implement it properly without regulatory guidance. But I need not resolve this extremely difficult question of administrative law to reach a decision in this case.

HHS has not failed to promulgate implementing regulations here. It is obvious that the federal government did act. And I have held that, in acting the way it did, HHS acted improperly. The record further demonstrates that HHS acted the way it did expressly because it believed that the states, presumably including Pennsylvania, would be *unable* to implement the provisions of OBRA without federal guidance.

Pennsylvania is, of course, correct that my holding the federal regulations invalid under the APA is not sufficient to allow plaintiffs to prevail on the merits of their claim against the Commonwealth. But both the testimonial and documentary record establish conclusively that the Commonwealth relied to an extremely significant extent on these invalid federal regulations. A simple comparison of the wording of the promulgated state regulations with the wording of the invalid federal regulations shows that time and again the Commonwealth merely copied the precise language from the federal regulations. Further, the explanatory material published by the Commonwealth accompanying its promulgation of state regulations states numerous times that its regulations are based on, required by, or follow the federal regulations. Finally, in several instances, such as the part-time worker earned income and child-care

disregard sections, the Commonwealth regulations exercise authority specifically delegated to HHS. Absent sub-delegation from HHS, which in at least those two instances has been provided in the invalid regulations, the Commonwealth has no authority to regulate on these matters.[10]

Thus, I hold that the Pennsylvania regulations promulgated on November 7, 1981 (to be effective November 9, 1981) are so pervasively tainted by the invalidity of the federal administrative process that allowing implementation of OBRA pursuant to these regulations would be equivalent to allowing a violation of the APA to stand unremedied. If the federal government can issue defective interim final regulations and the states can rely on them and implement federal programs pursuant to those regulations, then the plaintiffs would be deprived of their statutory right to comment on the implementing regulations before experiencing the adverse action authorized by the statute and invalid federal regulations. Thus, if my holding that the federal government violated the APA is to have any substantive effect at all, I must enjoin the state from implementing the provisions of OBRA in reliance on state regulations pervasively tainted by invalidly promulgated federal regulations.[11]

## C. Balancing of the Equities

First, I have been unable to shape, and the parties have not proposed, any alternative remedy to permanent injunctive relief that would put plaintiffs in the position that they should have been had the federal regulations been validly promulgated. It would be impossible for me to shape a narrower decree striking down only those sections of the Commonwealth regulations that are themselves the subject of impermissible taint for the simple reason that I am unable to identify which sections would fit into this category.

Second, the benefits to the plaintiffs of injunctive relief are quite substantial. Issuing a permanent injunction would prevent the Commonwealth from relying on regulations that I have held to be in complete derogation of plaintiffs' rights to public comment guaranteed by the APA. On the other hand, refusing to issue a permanent injunction will result in 110,000 Pennsylvania AFDC recipients losing a total of more than five million dollars in benefits each month before having an opportunity to comment at a meaningful point in time on proposed federal regulations implementing these cuts.

Third, I recognize that the hardship on the Commonwealth should injunctive relief be granted is significant. The Commonwealth stands to lose $2.5 or $5 million dollars per month as a result of my holding today.[12] But the Commonwealth's presen-

---

**10.** The full extent of the interrelationships between the November 7, 1981 Pennsylvania regulations and the invalid sections of the federal regulations is explored comprehensively in Appendix A.

**11.** I decline to parse the state regulations as I do the federal regulations and decide that some regulations are valid and some are not. In my view, the taint caused by the improper federal procedure has so poisoned the entire state regulatory procedure that Pennsylvania's November 7, 1981 regulations must be stricken down as a block. Although this result may appear harsh, my analysis of these regulations in Appendix A leaves me no choice but to strike down the entire set of state regulations. I emphasize, however, that I am not enjoining the Commonwealth from implementing the cuts in its AFDC program contemplated by OBRA; this decision merely enjoins such im-

plementation based on the November 7, 1981 regulations.

**12.** The Commonwealth will lose approximately $2.5 million dollars each month that it does not implement the OBRA cuts as a result of foregone savings that it could have realized through prompt implementation of that statute. The second $2.5 million dollars would be lost only if HHS found Pennsylvania to be out of compliance with federal standards and therefore withheld its matching grants for the extra money that the Commonwealth would be forced to spend as a result of my decree. It is my view, although the issue is not before me at this time, that such a finding by the federal Secretary would be completely unreasonable given that it is *his* failure to comply with basic procedural safeguards that has placed Pennsylvania in this position in the first place.

In addition, there is evidence that Pennsylvania is now out of compliance with OBRA inde-

tation implies that it will not experience this burden. The record shows that Pennsylvania has appropriated $647 million dollars to its cash assistance programs and that that is the entire sum of money to be expended on those programs by the Commonwealth this year. Thus, the testimony was that if this court granted plaintiffs' request for a permanent injunction, the Commonwealth would be forced to implement ratable reductions across the board to all Pennsylvania AFDC recipients. Assuming that I am correct and Pennsylvania will be suffering a loss of only approximately $2.5 million dollars each month as a result of my holding, the record shows that the size of the reductions would be approximately $12.50 per household each month.[13] In balancing the substantial certain harm to 110,000 Pennsylvania AFDC recipients against the potential harm to either the Commonwealth or all AFDC recipients, I conclude that injunctive relief is appropriate.

Fourth, aside from the discussion in the preceding paragraph, the record is devoid of any evidence of hardship on third parties regardless of which way I rule on plaintiffs' motion.

Fifth, although the Commonwealth's interest "in conserving scarce fiscal and administrative resources . . . is a factor that must be weighed," *Mathews v. Eldridge*, 424 U.S. 319, 348, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976), the administrative burden is "not overriding in the welfare context." *Goldberg v. Kelly*, 397 U.S. 254, 266, 90 S.Ct. 1011, 1019, 25 L.Ed.2d 287 (1970).

Finally, the public and social consequences of granting injunctive relief strongly outweigh those same consequences resulting from a denial of plaintiffs' requested relief. As discussed throughout this opinion, I accord great weight to the plaintiffs' right under the APA to participate in a public comment period before suffering any adverse consequences as a result of any regulatory promulgation. *See Community Nutrition Institute v. Butz*, 420 F.Supp. 751, 757 (D.D.C.1976) (in the context of a preliminary injunction hearing, court finds that plaintiffs are suffering immediate and irreparable harm by reason of being denied effective participation in the rulemaking process).

Thus, in the exercise of my discretion, following a complete review of the testimonial and documentary record in this case, I hold that the balance of the equities favors granting plaintiffs injunctive relief, at least with respect to implementation of the November 7, 1981 regulations.

### D. Appropriate Relief

As stated above, I do not reach the issue whether the Commonwealth could, if writing on a clean slate, implement OBRA without federal regulations. Having held substantial portions of the federal regulations invalid, however, and having held that the November 7, 1981 Pennsylvania regulations are pervasively tainted by the invalid promulgation of the federal regulations, my injunctive relief reaches only so far as the tainted Commonwealth regulations. I therefore enjoin Pennsylvania from implementing any AFDC cuts pursuant to its November 7, 1981 regulations or in reliance on the federal regulations declared invalid in this case.

### IV. Conclusion

This case has presented me with four interrelated issues involving the OBRA cuts

---

pendent of my ruling today. The Commonwealth delayed implementation of OBRA until Nov. 9, 1981, despite the absence of a waiver by HHS. Pennsylvania has not yet promulgated regulations implementing the OBRA changes in step-parent income policy, recoupment requirements, or retrospective budgeting policy. There is no evidence that HHS is denying or will deny Pennsylvania federal financial participation because of its current nonconformity. I doubt such participation would be denied where HHS itself caused the noncomformity.

**13.** I note that it would be pure speculation for either me or a witness to attempt to predict whether, in fact, the $647 million dollar Pennsylvania welfare budget is fixed. Although it is possible that no more funds would be appropriated to the assistance program, it is also possible that the legislature would pass a supplemental appropriation therefore eliminating the need for a ratable reduction.

to the AFDC program. First, I have held, both as a matter of law and as a matter of fact, that the defendant Secretary of HHS lacked good cause to dispense with the traditional notice and public comment provisions of the APA. Second, I have held that the only remedy sufficient to restore the plaintiffs to the position in which they would have been had the federal defendant not violated their statutory rights is a declaratory judgment holding all substantive rules within the promulgated federal regulations invalid. Third, I have held that the Commonwealth's regulations promulgated November 7, 1981 are so intertwined with both the invalid federal regulations themselves and the improper process through which those regulations were developed that the Commonwealth should not be permitted to implement any AFDC cuts in reliance on those regulations. Finally, in the exercise of my discretion as a trial judge, I have determined that permanent injunctive relief precluding Pennsylvania from implementing its November 7, 1981 regulations is the only appropriate remedy against the Commonwealth defendant.

The foregoing shall constitute my findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

### APPENDIX A

#### I.  Exercises of Discretion Authorized by OBRA

##### A.  Section 2301(8)(A)(i)

**1.  The Statute**

Section 2301(8)(A)(i) provides for a disregard of all earned income received by a defendant child "who is (as determined by the state in accordance *with standards prescribed by the Secretary*) a full-time student . . . ."

**2.  The Federal Regulations**

Section 233.20(a)(11)(i)(A) exercises the power delegated by this section of OBRA. The federal regulation defines a student in terms consonant with the statute, but does not define the term "full-time." The feder-

al Secretary has exercised his discretion and elected to leave the definition of that term to the states. *See* 46 Fed.Reg. 46761 (Sept. 21, 1981).

**3.  The State Regulations**

The Pennsylvania regulations, in express reliance on the federal regulations, conform on the issue of disregarding the earned income of a full-time student. "This revision is required to comply with Federal regulations, 45 C.F.R. § 233.20(a)(11), as published in 46 Reg. [*sic*] 46765 on September 21, 1981 and the amendments to the Social Security Act." 11 Pa.Bull. 3975 (Nov. 7, 1981).

##### B.  Section 2301(8)(A)(ii)

**1.  The Statute**

Section 2301(8)(A)(ii) provides in part that, in determining the need and amount of assistance of an applicant or recipient, the state shall disregard the first seventy-five dollars per month of earned income *or such lesser amount as the Secretary may prescribe in the case of an individual not engaged in full-time employment or not employed throughout the month.*

**2.  The Federal Regulations**

In section 233.20(a)(11)(i)(B)(1)(i) the federal Secretary has exercised discretion authorized by OBRA and directed the states to have in place a procedure under which they determine and apply an earned income disregard for work expenses in an amount of less than seventy-five dollars for part-time employees or for those working less than a full month.

**3.  The State Regulations**

The preamble to the Commonwealth's regulations explicitly acknowledges that the federal regulations "granted the Department discretion in setting the amount for the lesser disregards for the standard deduction and dependent care disregard when the client is employed less than full time or not employed throughout the month." 11 Pa.Bull. at 3977. In section 183.44(d)(1)

Pennsylvania then exercised this subdelegation of authority from the federal Secretary.

### C. Section 2301(8)(A)(iii)

#### 1. The Statute

Section 2301(8)(A)(iii) also provides that, in determining the need and amount of assistance of an applicant or recipient, a state shall disregard from earned income an amount equal to expenditures for care in a month for a dependent child or incapacitated individual up to $160 *or such lesser amount as the Secretary may prescribe in the case of an individual not engaged in full-time employment or not employed throughout the month.*

#### 2. The Federal Regulations

In section 233.20(a)(11)(i)(B)(1)(ii), the federal Secretary exercised the discretion authorized by OBRA and directed the states to have in place a procedure under which they determine and apply an earned income disregard for child care or incapacitated adult expenses in an amount of less than $160 for part-time employees or for those working less than a full month.

#### 3. The State Regulations

The preamble to the Commonwealth regulations explicitly notes that the federal regulations "granted the Department discretion in setting the amount for the lesser disregards for the standard deduction and dependent care disregard when the client is employed less than full-time or not employed throughout the month." 11 Pa.Bull. at 3977. Pennsylvania then exercised the subdelegation of authority from the federal Secretary in section 183.44(d)(2).

### D. Section 2301(8)(B)

#### 1. The Statute

Section 2301(8)(B) additionally provides that certain earned income disregards shall not be available to a person who, without good cause, terminates his employment, reduces his earned income, or refuses to accept appropriate employment within a peri-od of not less than thirty days preceding the month the disregard would otherwise have been available, *as may be prescribed by the Secretary.*

#### 2. The Federal Regulations

Section 233.20(a)(11)(iii) of the federal regulations exercises the discretion granted by OBRA to prescribe the period within which a person who, without good cause, either terminates employment or refuses employment and who is therefore to be denied the benefit of the disregard provisions. The Secretary selected a period of thirty days.

#### 3. The State Regulations

Section 183.44(e) of the Pennsylvania regulations expressly conforms to the Secretary's interpretation.

### E. Section 2302

#### 1. The Statute

Section 2302 provides in part that determination of the amount of resources of the AFDC family shall not include the family's ownership interest in one automobile *as does not exceed such amount as the Secretary may prescribe.*

#### 2. The Federal Regulations

In section 233.20(a)(3)(i)(B)(2) the federal Secretary exercised the discretion authorized by OBRA and directed that the dollar limitation on resources excludes one automobile up to $1500 of equity value or such lower limit as each state may specify. Note that the latter portion of this exercise of discretion is another example of the federal Secretary subdelegating responsibilities to the states that were originally delegated expressly to him.

#### 3. The State Regulations

In the preamble to the Commonwealth regulations it is explicitly noted that "[t]hese changes are required by ... [OBRA] and Federal regulations." 11 Pa. Bull. at 3969. Pennsylvania also recognizes in its preamble that it had the option under

the federal regulations to select a value lesser than $1500 "but chooses to allow the $1500 maximum." *Id.* Section 181.-43(a)(1)(iii) implements this exercise of the federal Secretary's discretion in the Commonwealth regulations. Of course, the Commonwealth remains free to lower the amount of this disregard at any time in the future.

### F. Section 2305

#### 1. The Statute

Section 2305 provides that an individual's income for AFDC purposes shall also include, *to the extent and under the circumstances prescribed by the Secretary*, an amount equal to the earned income advance amount payable to such individual.

#### 2. The Federal Regulations

In section 233.20(a)(6)(ix), the federal Secretary exercised the discretion authorized by OBRA and provided the extent and circumstances under which an individual's income for AFDC purposes will include an amount attributable to the earned income advance amount under section 3507(a) of the Internal Revenue Code of 1954.

#### 3. The State Regulations

Once again, the Commonwealth Secretary explicitly relies on the published federal regulations (and not the statute itself) in explaining its regulations under the earned income tax credit provisions in the preamble to these regulations. 11 Pa.Bull. at 3977. Further, section 183.44(c)(3) of the Commonwealth regulations implements the discretion exercised by the federal Secretary in his regulations.

### G. Section 2306

#### 1. The Statute

Section 2306 provides in part that, for purposes of determining an individual's income, each state shall take into consideration so much of the income of that individual's step-parent as exceeds various amounts, including the first seventy-five dollars of the step-parent's earned income in a month or such lesser amount as the Secretary may prescribe in the case of an individual not engaged in full-time employment or not employed throughout the month.

#### 2. The Federal Regulations

In section 233.20(a)(11)(v) the federal Secretary exercised the discretion authorized by OBRA and directed the states to have in place a procedure under which they determine and apply an earned income disregard of less than seventy-five dollars for step-parents who are employed part-time or are not employed throughout the month. Once again, as with all of the other congressional delegations on part-time worker provisions, the federal Secretary has subdelegated his regulatory authority to the states.

#### 3. The State Regulations

Pennsylvania regulations do not implement any of the OBRA changes relating to step-parent income.

### H. Section 2307

#### 1. The Statute

Section 2307 authorizes the states to develop Community Work Experience Programs and additionally requires such programs, when established, to make provision for the transportation and other costs of participants, *not in excess of an amount established by the Secretary*, reasonably necessary and directly related to participation in the program.

#### 2. The Federal Regulations

In section 238.60 the federal Secretary exercised the discretion authorized by OBRA and authorized matching grants by HHS for state payments to defray reasonable and necessary transportation and other costs of participants in Community Work Experience Programs not in excess of twenty-five dollars per month per participant.

#### 3. The State Regulations

The Community Work Experience Program is optional with the states and Pennsylvania has not yet chosen to establish such

a program. Legislation has been proposed, however, and is apparently being given active consideration.

## I. Section 2315(a)(14)(A)

### 1. The Statute

Section 2315(a)(14)(A) provides in part that AFDC recipient families must provide the state with monthly reports of certain information, *except that with the prior approval of the Secretary*, the state may select categories of recipients who may report at specified less frequent intervals upon the State's *showing to the satisfaction of the Secretary* that the monthly reporting of such individuals would result in unwarranted administrative expenditures.

### 2. The Federal Regulations

In section 233.36(b) the federal Secretary exercised the discretion authorized by OBRA and provided the criteria for permitting states to exempt categories of recipients for monthly reporting.

### 3. The State Regulations

To date, the Commonwealth has not promulgated any regulations on this subject. Of course, given the OBRA grant of authority and the federal Secretary's exercise of discretion, Pennsylvania is free to do so at any future point in time.

## II. Exercises of Discretion on the Secretary's Own Motion

### A. Section 2301

### 1. The Statute

Section 2301 changes prior law by limiting work expense and child care deductions to standard amounts, by limiting the "thirty dollar plus one-third of the remainder" disregard to a period of four months, and by changing the sequence of the benefit calculation to apply the "thirty dollar plus one-third of the remainder" disregard after other deductions (thus reducing the remainder to which the one-third fraction is applied).

### 2. The Federal Regulation

In the preamble to his regulations, the federal Secretary explicitly noted that the regulatory changes were mandated by both the statute "and decisions made on issues arising from the legislation." 46 Fed.Reg. at 46758. The federal Secretary then entered into an extended discussion of these issues with the detailed explanation of the reasons for the discretionary choices made by HHS in promulgating the regulations as it did. *See id.*

The interim final regulations themselves also obviously involve substantive discretionary choices by the federal Secretary:

(1) In section 233.20(a)(11) the federal Secretary interpreted the four month limitation on the thirty dollar plus one-third of the remainder earned income disregard to apply to current (as of October 1, 1981) recipients beginning in February 1982 rather than as of October 1, 1981.

(2) In section 233.20(a)(11)(ii) the federal Secretary interpreted the thirty dollar part of the thirty dollar plus one-third of the remainder earned income disregard to apply to each recipient worker rather than to the total family earnings.

(3) In section 233.20(a)(11)(iii) the federal Secretary interpreted the thirty dollar plus one-third of the remainder earned income disregard not to apply in a month in which a recipient seeks the termination of AFDC solely to avoid losing this disregard owing to the four month limitation.

(4) In section 233.20(a)(11)(i)(B)(1)(i) the federal Secretary interpreted how states should compute work expenses for self-employed individuals.

I therefore hold that, owing to the type of discretion exercised by the Secretary as well as the substantial effect that exercise will have on the substantive rights of AFDC recipients, all these sections of the federal regulations are substantive rules under the APA.

### 3. The State Regulations

The preamble to the Commonwealth regulations notes explicitly that the changes in

Pennsylvania regulations "are required by . . . [OBRA] and Federal regulations published at 46 Fed.Reg. 46765 (September 21, 1981)." 11 Pa.Bull. at 3976. Further, section 183.44 of the Commonwealth regulations implements in a general fashion the various exercises of discretion of the federal Secretary.

### B. Section 2302

#### 1. The Statute

Section 2302 of OBRA governs determinations of income and resources of recipients. In relevant part, that section provides a $1,000 family resource limit. The statute itself exempts from consideration only the family home and an ownership interest in an automobile.

#### 2. The Federal Regulations

The preamble to the HHS regulations discusses an extremely significant and substantive exercise of discretion by the federal Secretary with respect to this section. HHS first made the significant discretionary judgment that "items of personal property essential to day to day living" would be excludable from the $1,000 family resource limitation. 46 Fed.Reg. at 46755. Further, the federal Secretary declined to develop a comprehensive definition of resources, instead allowing the states, at their option, to develop such a list of exemptions from the $1,000 family resource limitation. Section 233.20(a)(3)(i)(B)(3) of the federal regulations legislates this exercise of discretion by the federal Secretary.

I hold that, owing to the type of discretion exercised by the Secretary as well as the substantial effect that exercise will have on the substantive rights of AFDC recipients, this section of the federal regulations is a substantive rule under the APA.

#### 3. The State Regulations

Once again, the Commonwealth's preamble explicitly notes that its regulatory changes "are required by . . . [OBRA] and Federal regulations published at 46 Fed. Reg. 46763 (September 21, 1981)." 11 Pa. Bull. at 3969. Further, the Commonwealth notes that "[f]ederal regulations published at 46 Fed.Reg. 46763 permit the State to establish a lower resource limitation per assistance unit than $1,000, but Pennsylvania has chosen to allow the maximum limit of $1,000." Id. Section 181.43(a)(1)(ii) of the Pennsylvania regulations implements the significant exercise of discretion by the Secretary.

### C. Section 2304

#### 1. The Statute

Section 2304 provides that receipt of a lump-sum income payment exceeding the applicable standard of need will render the recipient's family ineligible for AFDC for the number of full months derived by dividing the total income for the month by the applicable need standard.

#### 2. The Federal Regulations

In order to implement this complicated provision, the federal Secretary found it necessary to address two important issues he deemed not foreclosed by the literal language of the statute. First, the Secretary needed to determine whether the assistance unit had to be considered ineligible in the month of receipt of the lump-sum payment and therefore subject to the new overpayment/recoupment rules. Second, the Secretary needed to determine whether the period of future ineligibility had to be calculated on the standard of need for the current family size even though the family composition might change during the period of ineligibility. See 46 Fed.Reg. at 46755.

The federal Secretary concluded in the preamble that, with respect to the first issue, "a state consider the unit ineligible in the month of receipt of the nonrecurring income as this would represent the first month of ineligibility for which any overpayments would be recouped." Id. With respect to the second issue, section 233.20(a)(3)(ii)(D) provides that where, owing to receipt of a lump sum a family is deemed ineligible for AFDC payments, future changes in family composition or other relevant circumstances do not change or alter the period of ineligibility.

I hold that, owing to the type of discretion exercised by the Secretary as well as the substantial effect that exercise will have on the substantive rights of AFDC recipients, this section of the federal regulations is a substantive rule under the APA.

### 3. *The State Regulations*

Again, the preamble to the Commonwealth regulations explicitly notes that the Pennsylvania regulatory changes "are required by ... [OBRA] and Federal regulations published at 46 Fed.Reg. 46750 (September 21, 1981)." 11 Pa.Bull. at 3973. Section 177.23(a)(9)(ii)(B) is the Commonwealth regulation implementing the discretion exercised by the federal Secretary on the two issues discussed above.

### D. Section 2306

#### 1. *The Statute*

Section 2306 amends the rule of *King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), to allow assumption of step-parent income whether or not such income is actually available to the dependent child.

#### 2. *The Federal Regulations*

The preamble to the federal regulations again discusses a number of options that the federal Secretary felt the statutory language provided him. First, he determined that Congress did not intend to apply section 2306 to states having a law of general applicability holding the step-parent legally responsible to the same extent as a natural parent. 46 Fed.Reg. at 46754. Second, a detailed discussion of the various alternative approaches to several issues involved in the administration of section 2306 followed, the most significant of which was the Secretary's determination that the income of a step-parent for AFDC purposes should not include SSI payments. 46 Fed.Reg. at 46754–55.

In section 233.20(a)(11)(v) the federal Secretary interpreted the step-parent income deeming provisions to apply only in states in which there is no law of general applicability. I hold that, owing to the type of

discretion exercised by the Secretary as well as the substantial effect that exercise will have on the substantive rights of AFDC recipients, this section of the regulations is a substantive rule under APA.

### 3. *The State Regulations*

Pennsylvania has yet to promulgate Commonwealth regulations governing assumption of step-parent income.

### E. Section 2307

#### 1. *The Statute*

Section 2307 authorizes the states to develop and establish Community Work Experience Programs.

#### 2. *The Federal Regulations*

In section 238.18 the federal Secretary interpreted the Community Work Experience Program provisions as permitting states to provide workmen's compensation or other comparable protection to participants and to receive federal matching funds for such expenditures. Further, in section 238.50 the federal Secretary interpreted the Community Work Experience Program provisions to allow only public agencies and nonprofit organizations to be sponsors.

I hold that owing to the type of discretion exercised by the Secretary as well as the substantial effect that exercise will have on the substantive rights of AFDC recipients, this section of the regulations is a substantive rule under the APA.

### 3. *The State Regulations*

The Commonwealth has yet to promulgate regulations governing the Community Work Experience Program.

### F. Section 2309

#### 1. *The Statute*

Section 2309 authorizes the states to formulate and establish Work Incentive Demonstration Programs.

### 2. The Federal Regulations

In section 205.80 the federal Secretary interpreted what types of information should be given by states to HHS so that HHS can evaluate Work Incentive Demonstration Projects. I hold that, owing to the type of discretion exercised by the Secretary as well as the substantial effect that exercise will have on the substantive rights of AFDC recipients, this section of the federal regulations is a substantive rule under the APA.

### 3. The State Regulations

Pennsylvania has yet to promulgate state regulations governing Work Incentive Demonstration Programs.

### G. Section 2310

#### 1. The Statute

Section 2310 added a new provision to the AFDC program requiring states to deny benefits to any recipient participating in a strike and to the family of the striking "caretaker relative with whom the child is living."

#### 2. The Federal Regulations

The preamble to the federal regulation reflects an important exercise of discretion affecting substantive rights of recipients by interpreting the relevant portion of the regulations "to apply to any caretaker relative, regardless of whether that relative is legally or nonlegally liable for the support of the dependent child and regardless of whether that relative is needy or non-needy." 46 Fed.Reg. at 46761. The preamble also recognizes the wide variety of policy choices impliedly delegated to the Secretary by the very general section 2310. See id.

In section 233.106 of the federal regulations the Secretary interpreted that the term "strike" must be defined by states using the National Labor Relations Act (NLRA) definition or any other definition currently contained in state law. I hold that, owing to the type of discretion exercised by the Secretary as well as the substantial effect that exercise will have on the

substantive rights of AFDC recipients, this section of the federal regulations is a substantive rule under the APA.

### 3. The State Regulations

The Commonwealth's regulations fully conform to the federal regulations and the various exercises of discretion made therein. With regard to the choice of definition of the term "strike," the Commonwealth Secretary cites to the federal regulation itself for the authority to use the NLRA definition. See 11 Pa.Bull. at 3966. Further, section 183.22 of the Pennsylvania regulations adopts that definition expressly. Similarly, the federal Secretary's discretionary interpretation that regardless of whether the relative is a legally liable relative, the family is ineligible, is reflected in Pennsylvania's new regulatory section 183.-24(d)(2)(i).

### H. Section 2311

#### 1. The Statute

Section 2311 limits AFDC eligibility to children under age eighteen, or at each state's option, children under age nineteen who are full-time students reasonably expected to complete secondary school before reaching age nineteen.

#### 2. The Federal Regulations

In his preamble to the interim final federal regulations, the HHS Secretary acknowledged an explicit exercise of discretion in implementing the rule applying to students between the ages of eighteen and nineteen:

The major issue considered in developing the regulation was whether we should provide Federal definitions for "full-time student" and other terms used in the statute. The decision was that it should be left to each State to define full-time student in accordance with State law, to determine which vocational or technical training courses are equivalent to the level of secondary school, and to decide which factors the State agency will consider in deciding whether an individual may reasonably be expected to complete

the program of study or training before reaching age nineteen.

46 Fed.Reg. at 46761–62.

In section 233.90 of the federal regulations the Secretary implemented the discretion discussed in his preamble and sub-delegated those tasks to the individual states. I hold that, owing to the type of discretion exercised by the Secretary as well as the substantial effect that exercise will have on the substantive rights of AFDC recipients, this section of the federal regulations is a substantive rule under the APA.

### 3. The State Regulations

In addition to the standard general statement in the Commonwealth's preamble to the effect that these regulatory changes are required by both OBRA and the federal regulations, the Commonwealth Secretary cited specifically to the federal Secretary's exercise of discretion noted above. *See* 11 Pa.Bull. at 3962. Further, sections 145.-43(a)(1) and (c)(1) specifically implement and conform to the federal regulations cited above.

### I. Section 2312

#### 1. The Statute

Section 2312 limits optional state payments to an otherwise AFDC-eligible pregnant woman to months within three months of the expected month of birth, and to meet the needs only of the pregnant woman, not the unborn child.

#### 2. The Federal Regulations

Three issues not apparent on the face of the statute were considered and discussed in the federal Secretary's preamble to his regulations: (1) special needs for pregnant women with no other children and those already receiving AFDC; (2) when coverage for pregnant women begins; and (3) changes in circumstances. 46 Fed.Reg. at 46752.

In section 233.90(c)(2)(i)(v)(B) the federal Secretary interpreted the limitation on AFDC payments for pregnant women as permitting states to make special needs payments occasioned by or resulting from the pregnancy. I hold that, owing to the type of discretion exercised by the Secretary as well as the substantial effect that exercise will have on the substantive rights of AFDC recipients, this section of the federal regulations is a substantive rule under the APA.

### 3. State Regulations

Apparently, the Pennsylvania regulations decline the option provided them by the federal Secretary's exercise of discretion to provide any special needs AFDC payments to pregnant women.

### J. Section 2313

#### 1. The Statute

Section 2313 responds to the sex-discrimination finding in *Califano v. Westcott*, 443 U.S. 76, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979), by linking AFDC–UP eligibility to the unemployment of "the principal earner."

#### 2. The Federal Regulations

Once again, in his preamble to the federal regulations, the federal Secretary made a number of discretionary judgments interpreting the statute. *See* 46 Fed.Reg. at 46753. In section 233.100(a)(3)(vi)(B) the federal Secretary interpreted the unemployed parents provision as permitting states to designate which parent is the primary wage earner when both parents have identical income, thereby exercising yet another sub-delegation of power under OBRA. Further, in section 233.100(a)(3)(vi)(A) the federal Secretary interpreted that the new unemployed parents provisions apply both to new applicants and those recipients receiving AFDC since before October 1, 1981.

I hold that, owing to the type of discretion exercised by the Secretary as well as the substantial effect that exercise will have on the substantive rights of AFDC recipients, these two sections of the federal regulations are substantive rules under the APA.

### 3. *The State Regulations*

Once again, the Commonwealth Secretary's preamble notes that her regulatory changes "are required by . . . [OBRA] and Federal regulations published at 46 Fed. Reg. 46750 (September 21, 1981)." 11 Pa. Bull. at 3964. Section 153.44(d)(1)(i) explicitly adopts the federal Secretary's interpretation.

### K. *Section 2315*

### 1. *The Statute*

Section 2315 involves the complicated statutory provisions on retrospective budgeting and monthly reporting.

### 2. *The Federal Regulations*

The federal Secretary's preamble to his interim final regulations on monthly reporting addresses issues and choices surrounding the content of the monthly report, when a report is to be considered timely, how payment changes are put into effect when a timely report is filed, and when an untimely report is filed. 46 Fed.Reg. at 46759–60. Additionally, substantial discretion was exercised in the Secretary's implementation of the retrospective budgeting rules, both in determining eligibility prospectively and in computing the assistance payment. 46 Fed. Reg. at 46758–59.

Six separate regulatory enactments by the federal Secretary involve exercises of discretion under the retrospective budgeting and monthly reporting provisions:

(1) In section 233.37 of his regulations the federal Secretary interpreted the monthly reporting requirement as permitting a recipient a ten-day grace period following an adverse action to request a hearing on the action or, if no monthly report or an incomplete report was submitted, to cure the defect by filing a complete report.

(2) In section 233.34(b) and (c) of his regulations the federal Secretary interpreted the retrospective budgeting provisions to allow a state to calculate the AFDC payment for the first or second month of eligibility retrospectively if certain defined criteria are present.

(3) In section 233.34(d) of his regulations, the federal Secretary interpreted those situations in which a state may, under the retrospective budgeting provisions, suspend, rather than terminate, a recipient as a result of an extra paycheck received in any month.

(4) In section 233.35(a) of his regulations, the federal Secretary interpreted the retrospective budgeting provisions as requiring, in any month for which an individual will be determined eligible prospectively and will be added to an existing AFDC assistance unit, that states reflect the individual's needs and the payment for that month.

(5) In section 233.36(c) of his regulations, the federal Secretary interpreted the monthly reporting requirements as mandating states to direct recipients to report immediately to the state, rather than wait for their monthly report, regarding changes affecting their continued eligibility for AFDC.

(6) In section 233.35(b) of his regulations, the federal Secretary interpreted the retrospective budgeting provisions as requiring that the state, in the first month that retrospective budgeting is used, not count income already considered for the first payment month that is not of a continuous nature.

I hold that, owing to the type of discretion exercised by the Secretary as well as the substantial effect that exercise will have on the substantial rights of AFDC recipients, all these sections of the federal regulations are substantive rules under the APA.

### 3. *The State Regulations*

As of the date of this decision, the Pennsylvania regulations do not implement the retrospective budgeting and monthly reporting provisions of OBRA and HHS regulations. The federal defendant has apparently acquiesced in this failure to comply.

### L. *Section 2316*

### 1. *The Statute*

Section 2316 provides that "no payment of benefits shall be made under the plan for

any month if the amount of such payment . . . would be less than $10."

### 2. *The Federal Regulations*

The federal Secretary's preamble contained a short discussion on a number of options presented by this particular statutory language. *See* 46 Fed.Reg. at 46751. As a result of that discussion, in section 233.-20(a)(3)(viii)(C) the Secretary interpreted the statutory provision not to apply to situations in which recipients receive more than one check per month and the total of the checks is equal to or greater than ten dollars. Further, the Secretary interpreted the provisions not to apply to overpayment recovery situations in which, before the recovery, the recipient's check would have been equal to or greater than ten dollars.

I hold that, owing to the type of discretion exercised by the Secretary as well as the substantial effect that exercise will have on the substantive rights of AFDC recipients, this section of the federal regulations is a substantive rule under the APA.

### 3. *The State Regulations*

In section 224.24(b) the Commonwealth Secretary conformed her regulations to the interpretation embodied in the federal rules.

### M. *Section 2318*

### 1. *The Statute*

Section 2318 of the statute adds a new provision to the AFDC program requiring states to make adjustments for incorrect payments made to a recipient.

### 2. *The Federal Regulations*

In the preamble to promulgation of his interim final rules, the federal Secretary reveals that he decided to make "no distinction between wilful and non-wilful withholding of information by the recipient," 46 Fed.Reg. at 46762, a distinction made in previous federal agency regulations in this area.

In section 233.20(a)(13)(i)(D) the federal Secretary interpreted the incorrect pay-

ment adjustments provisions as requiring states to offset any overpayments against any underpayments before adjusting in situations in which both occur. Further, in section 233.20(a)(13) the federal Secretary interpreted the incorrect payment adjustments provisions as requiring states to recover overpayments from former recipients who reapplied based on present income and resources and also to pay underpayments to reapplying former recipients.

I hold that, owing to the type of discretion exercised by the Secretary as well as the substantial effect that exercise will have on the substantive rights of AFDC recipients, these two sections of the federal regulations are substantive rules under the APA.

### 3. *The State Regulations*

Pennsylvania has thus far failed to implement any state regulations conforming to the overpayment provisions of the federal statute and regulations. The record shows apparent federal acquiescence in this failure to comply.

### N. *Section 2320*

### 1. *The Statute*

Section 2320 limits AFDC aid to United States citizens and aliens lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law. It further adds a new, complex policy of requiring state agencies to consider the income and resources of the aliens' sponsors when determining the eligibility of aliens applying for AFDC.

### 2. *The Federal Regulations*

The preamble to the federal Secretary's promulgated interim final regulations contains extensive discussions on various discretionary issues vested in HHS. *See* 46 Fed.Reg. at 46760–61. As a result of this discussion of competing policy considerations, the federal Secretary promulgated three distinct regulatory requirements in section 233.51 of his regulations:

(1) The federal Secretary interpreted the date of entry or admission to the United States of an alien to be the date established by the Immigration and Naturalization Service as the date the alien was admitted for permanent residence.

(2) The Secretary interpreted that the income of an alien's sponsor for purposes of deeming to the alien shall not include AFDC or SSI payments.

(3) The Secretary interpreted that where an individual sponsors several aliens not living in the same home, the sponsor's income and resources will be equally divided among the aliens eligible for AFDC.

I hold that, owing to the type of discretion exercised by the Secretary as well as the substantial effect that exercise will have on the substantive rights of AFDC recipients, these sections of the federal regulations are substantive rules under the APA.

### 3. *The State Regulations*

The preamble to the proposed Pennsylvania regulations on sponsored aliens notes that the changes "are required by ... [OBRA] and Federal regulations published at 46 Fed.Reg. 46750 (September 21, 1981)." 11 Pa.Bull. at 3972. Further, the Commonwealth Secretary notes that "*[a]s a result of Federal revision* to 45 C.F.R. 233.50 and 233.51 as published in the 46 Fed.Reg. 46767 (September 21, 1981), and Section 2320 of the [OBRA]" certain changes must be made in the Pennsylvania regulations. *Id.* Sections 181.43(a)(4)(iv) and 183.44(i) conform to the discretion exercised by the federal Secretary.

### III. *Conclusion*

The foregoing also constitutes my findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).